[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-16645

_____

D.C. Docket Nos. 4:08-md-02004-CDL; 4:13-cv-00400-CDL


In re: Mentor Corp. Obtape Transobturator Sling Products Liability Litigation.

_____

PATRICIA PERRYMAN,

                                                            Plaintiff - Appellant,

versus

MENTOR WORLDWIDE LLC,

                                                            Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(August 28, 2018)

Before TJOFLAT and JULIE CARNES, Circuit Judges, and KAPLAN,[*] District Judge.

JULIE CARNES, Circuit Judge:

To treat the stress urinary incontinence of plaintiff Patricia Perryman ("Plaintiff"), her doctor surgically implanted one of Mentor Worldwide LLC's ObTape vaginal mesh products. Post-surgery, Plaintiff experienced a number of symptoms, including pain, tenderness, and infections, all of which were known side effects of mesh implants. Notwithstanding repeated visits to her doctor, as well as excisions of mesh that had begun protruding, Plaintiff's symptoms persisted. As a result, she eventually had the ObTape replaced with a different product, and her symptoms largely went away.

Seven years later, after learning from a television commercial that her post-operative symptoms may have been caused by defects in the ObTape, Plaintiff filed this products liability suit against Mentor in federal court. Mentor filed a motion for summary judgment arguing that Plaintiff's lawsuit was time-barred because her claim accrued by the time her ObTape implant was removed, yet Plaintiff did not file suit until seven years later—well outside the four-year statute of limitations period provided for by applicable Florida law. The district court

---

[*] Honorable Lewis A. Kaplan, Senior United States District Judge for the Southern District of New York, sitting by designation.

agreed, holding that, because Plaintiff was aware that her symptoms were related to the implantation of the ObTape mesh by the time it was removed, her claim accrued at that time and her subsequent lawsuit was several years too late.

Since the district court's ruling, however, our court has addressed this very same statute of limitations question under Florida law. *See Eghnayem v. Boston Sci. Corp.*, 873 F.3d 1304 (11th Cir. 2017). We must apply the standard used in *Eghnayem* for review of this particular question and, upon doing so, we conclude that a question of fact exists as to Mentor's defense and therefore reverse the district court's grant of summary judgment to Mentor.

## I.    BACKGROUND

### A.    Factual Background

In May 2005, Plaintiff's doctor surgically implanted a Mentor ObTape vaginal mesh "sling" to treat Plaintiff's stress urinary incontinence. Before the surgery, Plaintiff's doctor explained that the surgery had inherent risks, including bleeding, infection, urinary retention, injury to tissue, and pelvic pain. Likewise, mesh products themselves pose inherent risks. Plaintiff was informed that even if the mesh was properly implanted and even if there was nothing wrong with it, her body could nonetheless reject the product, and the mesh could protrude through the vaginal wall or cause infection. Indeed, Mentor's Product Insert Data Sheet

3

(essentially an informational pamphlet for doctors) indicated that "[v]aginal erosion, urethral evocation, and infection" were possible ObTape side effects, though they were reported "very rarely."

Plaintiff's surgery itself was unremarkable, but its consequences had a lasting impact. The surgery resolved her incontinence, but Plaintiff began experiencing vaginal infections along with pain and discomfort in her pelvic region. Over the course of roughly six months, Plaintiff repeatedly met with her doctor and complained of urinary retention, infections and the resulting vaginal discharge, and pain and tenderness during intercourse.

On multiple occasions, her doctor inspected her vagina, observed protruding mesh, and excised it. Despite the excisions, Plaintiff's symptoms persisted. Eventually, in February 2006, Plaintiff decided to switch doctors. Her new doctors recommended removal of the ObTape.

Accordingly, on February 17, Plaintiff's new doctors surgically removed her ObTape and replaced it with a different sling. The new sling was a "natural product" made with biological material that may be more likely to integrate with the human body than plastic synthetics like ObTape. During the surgery, one doctor definitively concluded that Plaintiff's ObTape had eroded through her vaginal tissue.

4

Plaintiff experienced no complications from her replacement surgery. Moreover, the infections and discharge stopped.  Plaintiff believed that this positive outcome was the result of her body accepting the new mesh material better than it had accepted the ObTape material.  Nonetheless, some portions of Plaintiff's ObTape sling could not be removed.  As a result, Plaintiff continues to experience some tenderness and pain.

After her initial surgery in May 2005, Plaintiff never felt that her ObTape implant was functioning properly.  She reached this conclusion because, before receiving the implant, she had never experienced the symptoms of discomfort, pain, vaginal discharge, and infections that occurred after the surgery.  When Plaintiff began experiencing these symptoms post-surgery, she "didn't know what caused" them and thought she "was just having an allergy to" the ObTape implant or her body was "rejecting . . . it or something."  As to why her ObTape implant was continually protruding, she thought this was because either her "body just wasn't accept[ing] it or maybe . . . [she] had an infection that was keeping things not healing right."  Altogether, Plaintiff "thought the problems were related to [her] personally or perhaps caused by some other factor besides the mesh." Plaintiff never suspected that ObTape was defective or that a specific defect in her

ObTape implant had caused her injuries until she saw a commercial in 2013 that reported the existence of vaginal sling defects.

## B. Procedural History

Alerted by television commercials to the fact that her symptoms may have been caused by defects in the ObTape, on September 4, 2013, Plaintiff filed a lawsuit in federal court as part of a consolidated multidistrict litigation action against Mentor over ObTape's alleged defects.[1] *See In re: Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, 588 F. Supp. 2d 1374 (J.P.M.L. 2008). Plaintiff alleged claims based on products liability, including negligence, fraudulent and negligent misrepresentation, breach of express and implied warranties, and fraudulent concealment.

After discovery, Mentor moved for summary judgment on the ground that Plaintiff's 2013 lawsuit was barred by Florida's four-year products liability statute of limitations because her claim accrued no later than February 2006, when her ObTape implant was removed. The district court granted summary judgment to Mentor, concluding that Plaintiff had become aware that her ObTape implant was related to her injuries no later than February 2006. Further, because she failed to

---

[1] Plaintiff is a resident of Florida and the surgery implanting the ObTape sling in 2005 was performed in Florida.

6

exercise due diligence, she could not toll the statute of limitations period based on a claim of fraudulent concealment.  Plaintiff filed a timely appeal under 28 U.S.C. § 1291.

## II.    STANDARD OF REVIEW

We review the grant of summary judgment and the application of a statute of limitations *de novo*.  *F.E.B. Corp. v. United States*, 818 F.3d 681, 685 (11th Cir. 2016).  In doing so, we view the evidence in the light most favorable to the nonmoving party and draw all inferences in that party's favor.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  To grant summary judgment, the moving party must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is "'genuine' only if a reasonable jury, considering the evidence presented, could find for the nonmoving party."  *Atheists of Fla., Inc. v. City of Lakeland*, 713 F.3d 577, 589 (11th Cir. 2013).

## III.    DISCUSSION

This is a diversity action, meaning that the substantive law governing the case is provided by state law.  The parties agree that the Florida statute of limitations is the applicable statute here and that Florida law controls the question whether this statute of limitations bars Plaintiff's claim.  *See Cambridge Mut. Fire*

*Ins. Co. v. City of Claxton*, 720 F.2d 1230, 1232 (11th Cir. 1983) ("[S]tate statutes of limitations are substantive laws and must be followed by federal courts in diversity actions.").

In resolving a very similar dispute, we have recently been called on to apply Florida law to the very question before us today. In *Eghnayem v. Boston Scientific Corporation*, 873 F.3d 1304 (11th Cir. 2017), the plaintiff, Eghnayem, had filed suit under Florida law for injuries she suffered after being implanted with a vaginal mesh device. A jury concluded that the statute of limitations did not apply because the plaintiff was not on notice of her claim more than four years before she filed the lawsuit. On appeal, the defendant sought reversal, arguing that, as a matter of law, the plaintiff had been on notice of a potential claim well prior to that date and had therefore filed beyond the limitations period. *Id.* at 1311–13.

We disagreed with the defendant. First, we observed that, under Florida law, the statute of limitations does not begin to run until "the date that the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence." *Id.* at 1323 (citing Fla. Stat. § 95.031(2)(b)). Examining Florida caselaw, we noted that such knowledge will be attributed to a plaintiff when the latter has "notice, through the exercise of reasonable diligence, of the possible invasion of [her] legal rights." *Id.* (internal quotation marks

8

omitted). Such notice can be inferred if there is "an injury <u>distinct</u> in some way <u>from conditions naturally to be expected from the plaintiff's condition</u>, and . . . exposure to the product in question," with some causal connection between the product and the injury. *Id.* (emphasis added) (internal quotation marks omitted).

Fleshing out a bit more what the above words mean, we explained in *Eghnayem* that Florida law looks to whether the injury was the type of injury that a patient might expect to occur to a person in her condition even when there had been no negligence on the part of the putative defendant. When "there is nothing about an injury that would communicate to a reasonable lay person that the injury is more likely a result of some failure of medical care than a natural occurrence that can arise in the absence of medical negligence, the knowledge of the injury itself does not necessarily trigger the running of the statute of limitations." *Id.* at 1324 (internal quotation marks omitted). The key is whether the injuries suffered after contact with a product were "sufficiently dramatic to provide notice" that something might be wrong with the product; that is, was there a dramatic change in the patient's condition suggesting a product defect? *Id.* To better illustrate the type of notice Florida law considered to be sufficiently "dramatic," we discussed a Florida case in which a child receiving leukemia medication developed convulsions and resulting paralysis, noting that the Florida Supreme Court had

9

found the development of these conditions to be so dramatic as to reasonably alert the parents that something could be amiss with the medication. *Id.* at 1323. That being so, the limitations period began with the onset of those symptoms. *Id.* We contrasted the above factual scenario with a Florida case in which a child's difficulty breathing following an invasive medical procedure was not deemed to be "so obviously unusual" that it put the parents on notice of a potential malpractice claim. *Id.* at 1323–24. Notice not being conveyed by these less dramatic symptoms, the Florida appellate court concluded that the limitations period did not begin at the time the above symptom appeared. *Id.*

The "distinct injury" requirement quoted above was key in *Eghnayem*. "Because even medical treatment competently performed might cause new unpleasant symptoms, an injury must stand out from the norm to start the statutory clock." *Id.* at 1324 (internal quotation marks omitted). In short, for a claim to accrue, a plaintiff's injuries must be "obviously unusual." *Id.*

Applying this framework, we held that Eghnayem's post-mesh implant symptoms were not "sufficiently distinct . . . from what might be expected after vaginal surgery to put her on notice of her cause of action." *Id.* Post-surgery,

10

Eghnayem's only new symptom was urinary incontinence.[2] *Id.* We observed that incontinence—although "a more dramatic symptom than some"—"was not so obviously unusual as to indisputably put Eghnayem on notice about her claim." *Id.* Accordingly, we affirmed the district court's denial of the defendant's motion for judgment as a matter of law and concluded that "the timeliness of Eghnayem's action was properly a question of fact for the jury." *Id.* at 1324.

Because of its marked similarity to the facts and legal issues presented in this case, *Eghnayem* dictates the same result here. *See Hattaway v. McMillian*, 903 F.2d 1440, 1445 n.5 (11th Cir. 1990) ("We note that as a panel we are generally bound by prior decisions of this court unless the court sitting en banc overrules the prior decision. . . . Of course, if *subsequent* decisions of . . . the Florida courts cast doubt on our interpretation of state law, a panel would be free to reinterpret state law in light of the new precedents." (emphasis in original)). Plaintiff experienced pelvic pain and discomfort, infection and vaginal discharge, and mesh protrusion. These symptoms were acknowledged side effects of ObTape implants, mesh implants generally, and mesh implant surgery. In other words, such symptoms could arise from a nondefective mesh that had been implanted through surgery that

---

[2] Unlike Perryman—who received her mesh implant to treat incontinence—the *Eghnayem* plaintiff received her mesh implant to treat "pelvic organ prolapse." *Eghnayem*, 873 F.3d at 1311.

11

was properly performed.  For example, one doctor observed that Plaintiff's eroded mesh was a "known complication"—"not something that . . . was an unusual fact that needed to be reported."  Thus, Plaintiff's symptoms were not "sufficiently distinct . . . from what might be expected after vaginal surgery to put her on notice of her cause of action" as a matter of law.  *Eghnayem*, 873 F.3d at 1324.  Taking all inferences in favor of Plaintiff, whether her claim had accrued by February 2006—when her ObTape implant was removed—is therefore a question of fact for the jury.

## CONCLUSION

In conclusion, *Eghnayem* controls this case.  Acknowledging that the district court did not have the benefit of this decision before ruling, we must nonetheless reverse its grant of summary judgment to Mentor.  Instead, a jury will be required to decide the underlying question of fact that will determine whether Plaintiff's action is barred by Florida's statute of limitations.

**REVERSED.**